UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

STIVEN SIRI-REYNOSO,

Petitioner,

-against -

21 CV 11009 (CM)
S6 17 Cr. 418 (CM)

UNITED STATES OF AMERICA,

Respondent.

_____ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1|3|2023

## DECISION AND ORDER DENYING DEFENDANT'S MOTION TO VACATE, SET ASIDE, OR CORRECT HIS CONVICTION AND SENTENCE

McMahon, J.:

Defendant Stiven Siri-Reynoso was convicted after a jury trial of racketeering conspiracy

(Count One), narcotics conspiracy (Count Two), murder in aid of racketeering (Count Three), and

murder through use of a firearm (Count Four).[1] On February 25, 2019, the Court sentenced Siri-

Reynoso to life plus five years' imprisonment: 20 years' imprisonment on Count One, 20 years'

imprisonment on Count Two, life imprisonment on Count Three, and five years' imprisonment

on Count Four, with the terms on Counts One, Two, and Three to run concurrently to each other,

and the term on Count Four to run consecutively.

Before the Court is Siri-Reynoso's motion to vacate, set aside, or correct his sentence

pursuant to 28 U.S.C. § 2255, filed on December 19, 2021 (Dkt. #156), supplemented on

February 11, 2022 (Dkt. #158). Siri-Reynoso argues *inter alia* that that his convictions and

---

[1] Defendant was acquitted on the additional counts submitted to the jury: Count Five, possession of firearms in connection with a narcotics trafficking conspiracy; Count Six discharging a firearm in connection with an attempted murder in aid of racketeering; and Count Seven conspiring to commit Hobbs Act robbery.

1

sentences should be vacated because: (1) the evidence at trial was insufficient to support his conviction, (2) his attorneys provided ineffective assistance before and during trial, (3) his cell-site information was obtained in violation of the Fourth Amendment, (4) the Government engaged in misconduct, and (5) the Court engaged in misconduct. In his Supplemental Petition, Siri-Reynoso argues that: (1) his conviction under § 924(j) must be vacated pursuant to *United States v. Davis*, 139 S. Ct. 2319 (2019), and (2) trial counsel was ineffective for additional reasons.

The Government asks the Court to deny the motion arguing that the motion is untimely, procedurally barred and meritless. In a reply memorandum entitled "Traverse to the Government's Answer," Siri Reynoso expands on the arguments he made in his original motion.

Background

The Government's evidence at trial established *inter alia* that: Siri-Reynoso was a longtime member of the DDP ("Dominicans Don't Play") gang which sold drugs, committed robberies, and engaged in other racketeering activity, in and around the John Adams Houses, in the Bronx, New York. *See* Trial Transcript, Dkt. ##68-96 ("Tr.") at 97-98, 102-04, 121-27, 179-80, 413-15, 598-99, 966-88, 947, 1075-79, 1092-93, 1099-1102 (testimony about Siri-Reynoso's offense conduct); *see also, e.g.*, *id.* at 103-08, 203-04, 408, 414- 15, 513-18, 530-43, 592-94, 822-23, 994-98, 1008-09, 1096, 1104-09, 1114 (testimony about DDP members, colors, signs, rules, meetings, and racketeering acts).

Regarding the murder at the center of this case, the trial evidence established that the DDPs had an ongoing rivalry with another Dominican gang known as the "Trinitarios," which also sold drugs and committed crimes around the John Adams Houses. *See id.* at 107, 515-19,

2

523-24, 529, 549-54, 558, 823-24, 1006-08, see also, *id.* at Tr. 408, 410, 418-20, 751, 850-51. On the night of June 11, 2016, a group of Trinitarios threatened Siri-Reynoso with a knife as he and another DDP member, Adonis Ruiz, were walking to the apartment of yet another gang member and his ex-wife, Ana Tiburcio. *See* Tr. at 153-56, 425. When Siri- Reynoso and Ruiz reached the apartment, they met Xavier Hernandez another DDP member and Siri-Reynoso's sixteen-year-old cousin, Wandy Tejada. Bent on retaliating against the Trinitarios for pulling a knife on him, Siri- Reynoso ordered his young cousin to go down to the John Adams Houses courtyard and shoot at the Trinitarios, and to look for and target particular Trinitarios. *See id.* at 152-56, 410-11.  Siri-Reynoso instructed Hernandez to give Tejada a black sweatshirt and a gun, and to make arrangements for two other DDPs—Fausto Torres and Luis Nunez—to drive Tejada away from the shooting scene. *See id.* at 155-60, 168, 426, 596-600, 605-09, 692-95.

Tejada dutifully obeyed his older cousin. He left the apartment with the gun, walked over to courtyard, and shot at the Trintarios gathered there. As fate would have it, Tejada missed his intended targets, but instead hit an innocent bystander, Jessica White, killing her as her three young children and her mother looked on. *See id.* at 73-74, 160-62, 1196; GX 109A-D. Tejada ran as planned to Torres's car, and fled the area. *See* Tr. at 165-69; GX 109C. In the car, Nunez showed Tejada a photograph of one of the rival Trinitarios and asked if Tejada had shot that person. *See* Tr. at 169.

The jury returned a verdict finding Siri-Reynoso guilty on Counts One through Four and not guilty on Counts Five through Seven. With respect to the racketeering conspiracy charged in Count One, the jury found that the Government had proven one act involving murder or attempted murder, multiple acts involving narcotics trafficking, one act involving robbery under New York state law, and no acts of Hobbs Act robbery. *Id.* On

3

Count Two, the jury found that the Government had proven that the narcotics conspiracy involved oxycodone and marijuana, but not alprazolam. *Id.* On Count Three, the jury found that Siri Reynoso caused the murder of Jessica White, in aid of racketeering. On Count 4, the jury concluded that Siri Reynoso caused the murder of Ms. White through the use of a firearm, that was in connection with drug trafficking and racketeering murder.

Siri-Reynoso filed a counseled motion for a judgment of acquittal or a new trial, wherein he argued that: (1) the Court should enter a judgment of acquittal or grant him a new trial on the murder counts because the evidence was insufficient to support the jury's verdict, and (2) an individual who was not on the jury throughout trial replaced one of the empaneled jurors and then read the verdict. Dkt. #99. Siri- Reynoso also separately sent the Court a document listing various alleged discrepancies in the evidence and instances of alleged misconduct on the part of the Government and law enforcement. Dkt. #102. The Court denied all of Siri-Reynoso's post-trial motions, finding that they all lacked merit. Dkt. #108.

On February 25, 2019, the Court sentenced Siri-Reynoso to life imprisonment plus five years to run consecutively. Dkt. #13.

Siri-Reynoso appealed his conviction on the grounds that: (1) the Government failed to disclose a letter from one of its cooperating witnesses until the jury was already deliberating, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972); (2) the Government violated *United States v. Massiah*, 377 U.S. 201 (1964), by offering testimony from a cooperating witness who was housed in the same jail as Siri-Reynoso; (3) the evidence was insufficient to support his convictions for racketeering, murder in aid of racketeering, aiding and abetting a murder, various firearms offenses, and conspiring or intending to distribute controlled substances. *See* 2d Cir. No.

4

19-516, Dkt. #63. In a summary order dated April 6, 2020, the Second Circuit affirmed

the conviction, holding, in relevant part:

> On review of the record before us, we conclude that Siri-Reynoso's sufficiency challenge is meritless. We do so for substantially the reasons given by the District Court with respect to Counts Three and Four in its January 11, 2019 'Ruling on Defendant's Post-Trial Motions.' The Government presented sufficient evidence at trial in support of all four counts of conviction, which included, but was not limited to, evidence about: Siri-Reynoso's direct involvement in the sale of oxycodone and marijuana; his membership in, and association with, the Dominicans Don't Play ("DDP") racketeering enterprise; DDP's rivalry with the Trinitarios; Siri-Reynoso's direction to his cousin (Tejada) to shoot at his gang rivals resulting in the murder of an innocent bystander (Jessica White) and the arrangement for Tejada's get-away car; Siri-Reynoso's posts in social media bragging about DDP's presence in disputed gang territory shortly after White's death; and the involvement of DDP members in White's murder, narcotics trafficking, and a robbery that Siri-Reynoso committed in 2009.

*United States v. Siri-Reynoso*, No. 19-516, 807 F. App'x 103, 105-06 (2d Cir. 2020). Siri-

Reynoso did not petition for a writ of certiorari, and his conviction became final 90 days

later on July 5, 2020.

### Habeas Standard

Under 28 U.S.C. § 2255, a habeas petitioner can obtain relief from a final judgment

only if he can show "a constitutional error, a lack of jurisdiction in the sentencing court, or

an error of law or fact that constitutes 'a fundamental defect which results in a complete

miscarriage of justice.'" *Graziano v. United States*, 83 F.3d 587, 589, 90 (2d Cir. 1996)

(quoting *United States Bokun*, 73 F.3d 8, 12 (2d Cir. 1995)). "The reasons for narrowly

limiting the relief permitted under § 2255—a respect for the finality of criminal sentences,

5

the efficient allocation of judicial resources, and an aversion to retrying issues years after the underlying events took place—are 'well known and basic to our adversary system of justice.'" *Bokun*, 73 F.3d at 12 (quoting *United States v. Addonizio*, 442 U.S. 178, 184 & n.11 (1979)). Although *pro se* petitioners are entitled to have their pleadings liberally construed, *see Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001), they also still bear the burden of proving, by a preponderance of the evidence, that they are entitled to relief, *see Triana v. United States*, 205 F.3d 36, 40 (2d Cir. 2000).

Siri-Reynoso's Petition Is Untimely

As a threshold matter, Siri-Reynoso's petition was filed after the time period allowed for the filing a petition pursuant to 28 U.S.C. § 2255.

Under 28 U.S.C. § 2255, habeas petitioners must file their motions within "[a] one-year period of limitation" that "shall run from the latest of" several dates, including, as material to this motion, "the date on which the judgment of conviction becomes final" or "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(1), (4).  When a defendant loses on direct appeal and does not appeal to the Supreme Court, the "judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction." *Clay v. United States*, 537 U.S. 522, 525 (2003); *see also, e.g.*, *Bellettieri v. United States*, Nos. 11 Civ. 7617 (LAP), 07 Cr. 123 (LAP), 2012 WL 6097771, at *1 (S.D.N.Y. Dec. 4, 2012). Under the Supreme Court's procedural rules, "a petition for a writ of certiorari to review a judgment in any case, civil or criminal, entered by a state court of last resort or a United States court of appeals . . . is timely when it is filed with the Clerk of this Court within 90 days after

6

entry of the judgment," and the 90-day "time to file a petition for a writ of certiorari runs
from the date of entry of the judgment or order sought to be reviewed, and not from the
issuance date of the mandate." Sup. Ct. R. 13(1), (3).

The Second Circuit denied Siri-Reynoso's direct appeal on April 6, 2020. Because
he did not file a petition for a writ of certiorari by the deadline of July 5, 2020, the deadline
for the instant Petition was July 5, 2021. The Petition was delivered to prison authorities on
December 19, 2021, *see* Pet. at 78 (Certificate of Service)—about five and a half months
beyond the one-year deadline for claims that were available to him throughout the entire
limitation period. *See* 28 U.S.C. § 2255(f)(1).

Siri-Reynoso argues that his deadline should be tolled based on "the Federal
Bureau of Prisons malfeasance in acting outside its legal authority in unlawfully seizing
inmates['] legal files," and "tak[ing] advantage of the COVID-19 World Pandemic." Pet. at
7; *see also* Supp. Pet. at 17; 21 Civ. 11009, Dkt. #1 at 15 (Siri-Reynoso's AO 243 Form
(hereinafter "Form Pet."), claiming that BOP seizes legal papers, opens inmate mail, and
"bastardize[] the forms clerks mail to those who request same"). He has failed, however, to
articulate how any specific impediment actually prevented him from filing his Petition on
time. He vaguely alleges mail seizures and lockdowns, but he has not explained what legal
papers or other materials were denied to him, or for how long, or why he needed them to
file the Petition, most of which consists of arguments that Siri-Reynoso has been making
since before his sentencing. He also attaches to his Supplemental Petition a number of BOP
notices concerning the postponement of a holiday meal, the resumption of normal
operations on January 20, 2022, and a national lockdown on February 1, 2022. *See* Supp.
Pet. at Exs. 3-5. But he does not articulate or prove how any BOP action prevented him

7

from filing his Petition on time in July 2021.

He also argues that he was prevented from filing because his sentencing attorney failed to provide him with documents from his case that he says were necessary for him to file his motion. Even if it were true that his counsel from the sentencing failed to provide Siri Reynoso with the requested paperwork,[2] it does not excuse his failure to timely file since he possessed everything to make the same arguments he has been making since his conviction.

Siri-Reynoso has thus failed to meet his burden under § 2255(f)(2).

The petition is untimely.

Procedural Bar

In addition to being untimely, Siri-Reynoso's § 2255 petition is procedurally defective: his petition asserts for the first time claims that should have been litigated on direct appeal, or, conversely, reasserts claims that were already decided on direct appeal.

Indeed, it is well settled that a petitioner is "barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal," unless he can show "(1) cause for the procedural default and ensuing prejudice or (2) actual innocence." *United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011). It is equally well settled that "once a matter has been decided adversely to a defendant on direct appeal it cannot be relitigated in a collateral attack under section 2255." *United States v. Natelli*, 553 F.2d 5, 7 (2d Cir. 1977) (barring § 2255 petition claiming insufficiency of the evidence); *see also, e.g.*, *United States v. Sanin*, 252 F.3d 79 (2001) ("[A] § 2255 petition cannot be used to

---

[2] On January 28, 2020, in response to Siri Reynoso's complaint that his lawyer did not provide him with his file, the Court directed Mr. Brandon (counsel assigned after the Court relieved trial counsel at defendant's request) to turn over what he had to his client.

relitigate questions which were raised and considered on direct appeal." (internal citations
omitted).

Moreover, while claims of ineffective assistance may not be procedurally barred
if not raised on direct appeal (because they often require expansion of the record), *see
Massaro v. United States,* 538 U.S. 500, 508-09 (2003), the "mandate rule" applies to
"ineffective assistance claims [that] are simply repackaged versions of claims
previously rejected on appeal," *United States v. Peirce*, Nos. 06 Cr. 1032 (RJS), 2011
Civ. 2526 (RJS), 2011 WL 4001071, at *3 (S.D.N.Y Aug. 30, 2011). The Second
Circuit has been clear that the mandate rule "bar[s] ineffective assistance claims in a
Section 2255 proceeding when the factual predicates of those claims, while not
explicitly raised on direct appeal, were nonetheless impliedly rejected by the appellate
court mandate." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (citing
*United States v. Pitcher*, 559 F.3d 120, 124 (2d Cir. 2009). For instance, ineffective
assistance claims must fail when they are "'premised on the same facts and rest on the
same legal ground' as the substantive claims adjudicated on direct appeal." *Peirce*, 2011
WL 4001071, at *4 (quoting *United States v. Pitcher*, 559 F.3d at 124) (rejecting
ineffective assistance claim based on trial counsel's failure to object to evidence that
Court of Appeals found was admissible).[3]

Siri-Reynoso did not argue on direct appeal that: (a) the Government's search of
his cell-site data violated the Fourth Amendment; (b) the Government engaged in
misconduct (except for the alleged *Brady/Giglio* violation based on a cooperating

---

[3] Although "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of
ineffective assistance," *Massaro v. United States*, 538 U.S. 500, 504 (2003), many of Siri-Reynoso's claims could
have been briefed on direct appeal without the need for further factual development. To the extent Siri-Reynoso
has not defaulted on his ineffectiveness claims, they are in any event meritless for reasons discussed below.

witness's letter, and alleged *Massiah* violation, neither of which is part of his Petition); (c) the Court engaged in any kind of misconduct; or (d) his attorneys were ineffective. All of the factual bases for those claims were available to him since at least the end of his trial, and indeed, Siri-Reynoso has raised many of them in his *pro se* motion for a new trial and in *pro se* filings prior to sentencing. He also has not even attempted to show cause for this default or resulting prejudice. Nor can Siri-Reynoso establish that he is actually innocent, given the extensive evidence against him that this Court and the Second Circuit outlined when rejecting his post-trial motions and appeal. He is therefore procedurally barred from asserting any of these claims now.

As to the claims he <u>did</u> raise on direct appeal, all of them were decided against him, and under the mandate rule, he may not now relitigate them again. Most notably, the Second Circuit already held that there was sufficient evidence to support Siri-Reynoso's guilt on all four counts of conviction. *Siri-Reynoso*, 807 F. App'x at 105-06. Siri-Reynoso's sufficiency argument—and his other arguments, however labeled, that rely on the same underlying factual points— are denied as procedurally barred.

Siri-Reynoso's Claims are Meritless

Even if Siri-Reynoso's petition was filed timely and his claims were not otherwise procedurally barred, his petition would fail nonetheless because his claims are without merit. Indeed, Siri-Reynoso's petition is replete with factual claims that are unsupported— or flatly contradicted—by the trial testimony, the evidence presented by the Government, and even his own exhibits.

*Siri-Reynoso's Phone Records*

Throughout his petition, Siri-Reynoso asserts that phone records prove he was not

10

in contact with various co-conspirators at specific times prior to the shooting, and that he was in Manhattan—not on Tinton Avenue in the Bronx—at 9:08 p.m., on June 11, 2016. *See, e.g.*, Pet. at 20, 33-35, 40 n.3, 44 n.9 (citing Pet. Ex. A).

Siri-Reynoso's Exhibit A appears to be a billing statement for the phone that he was using on the date of the White murder. However, the record does not support Siri-Reynoso's conclusions. First, on the face of the statement, it says that it lists only text message communications ("Text" in the top left corner, and "Text" under "Type"). This means that it does not show Siri-Reynoso's voice calls, which were almost all of the relevant communications mapped on the Government's cell-site presentation. *See* GX 211 at 22-23, 26-27. Even more importantly, the billing statement clearly says that "The date and time [of the listed communications] corresponds to Pacific Time (PST/PDT)," Pet. Ex. A, meaning that all the times are three hours behind east coast time.[4] The entry on the billing statement that lists the "Destination" as "New York, NY" (which itself would include the Bronx)—*i.e.*, the one Siri- Reynoso says proves his presence in Manhattan at 9:08 p.m.—in reality reflects a text message at 12:08 a.m. on June 11, 2016, several hours after any relevant events.

### *Tejada's and Torres's Cell Site Data*

Siri-Reynoso argues that the data from Tejada's phone shows connections to a cell site near the scene of the murder between 9:15 p.m. and 10:15 p.m., which conflicts with the testimony that Tejada fled to Manhattan in a car after the murder, and License Plate

---

[4] This is corroborated by the fact that the billing statement shows an incoming text message from a phone ending - 8566 at 12:15 a.m. on June 12, 2016, and the phone records entered at trial and mapped on the cell-site presentation show the same message coming into Siri-Reynoso's phone at 3:15 a.m. on the same date. *Compare* Pet. Ex. A, *with* GX 211 at 23.

Recognition ("LPR") data showing Torres's car entering Manhattan via the 145th Street Bridge at 10:10 p.m. *See* Pet. at 16, 45, 48 (citing GX 211); Supp. Pet. at 14-16. In fact, Tejada's phone data showed only two calls around the time of the murder—both of which were incoming from Siri-Reynoso—at 10:02 p.m. *See* GX 211 at 24, 26. Accordingly, there is no inconsistency between that evidence and the testimony that Tejada was in a car on the 145th Street Bridge eight minutes later.

Similarly, the cell site data for Torres's phone also does not contradict the timeline. Siri-Reynoso argues that Torres could not have been on Tinton Avenue in the Bronx when he received calls from Luis Nunez at 8:49 p.m. and 9:02 p.m. because the phone location data shows that Torres traveled into Manhattan around that time. *See* Supp. Pet. at 10 (citing GX 211 and Tr. 672-73). Siri-Reynoso once again misreads the testimony and evidence. The cell-site records indicated that Torres's cellphone connected to a tower on Tinton Avenue when he received the calls from Nunez. *See* GX 211 at 14. The testimony that "later in the evening we see the phone connecting to towers in Manhattan," Tr. at 672, referred to tower hits in Manhattan at 10:18 p.m. and 11:40 p.m., *see* GX 211 at 14—both after the murder had already occurred. And again, the phone location records also square with the LPR data, which showed Torres's car enter the Bronx at 7:49 p.m. and leave the Bronx at 10:10 p.m. *See* GX 701E, 701F.

*Video Footage*

Siri-Reynoso claims that police had access to video footage from "680 Tinton Avenue 152nd [S]treet" and that the Government failed to produce footage from 745 East 152nd Street to corroborate witness testimony about the defendant's and other people's comings and goings. Pet. at 32-35, 47. He also maintains that some of the video shown at trial was "photo-shop[ped]," and other clips were suspect because the recording skipped at

points. *See* Pet. at 15, 47-48, 74; Supp. Pet. at 15. None of these claims is supported by

any evidence. The Government has represented that it is not aware of law enforcement

having possession of any video footage from 680 Tinton Avenue or any unproduced

footage from 745 East 152nd Street. As to the video shown at trial, Government witnesses

explained all edits and imperfections in the footage, *see* Tr. 714-26. Siri-Reynoso offers no

reason to doubt the veracity of that testimony, and the jury was free to consider the quality

of the footage when weighing the evidence. Accordingly, Siri-Reynoso has failed to

establish any impropriety with respect to video footage.

*Tiburcio's Apartment Window*

Siri-Reynoso insists that it was impossible for him to have pointed out Tiburcio's

apartment window at the target of the shooting because (a) the target (Raymond, in a blue shirt)

was in the playground area behind Tiburio's building from approximately 9:32 p.m. until

approximately 10:03 p.m., and (b) Tiburcio's window faces the opposite direction, overlooking

East 152nd Street. *See* Pet. at 29, 42 & n.7, 76.

Siri-Reynoso both mischaracterizes the evidence and misunderstands the testimony on

this point. First, the video footage shows that after Raymond chased Siri-Reynoso out of the

lobby of Tiburcio's building, he walked to a pathway behind the building and turned *right*,

towards the *front* of the building on East 152nd Street. *See* GX 109D at 9:00-10:55. He returned

to the playground just minutes before Tejada walked outside and started shooting at almost 10:04

p.m. *See* GX 109C at 3:00-5:25. Second, Tejada *did not* testify that Siri-Reynoso "aimed" (*i.e.*,

pointed his own finger) at Raymond; rather, Tejada testified that Siri-Reynoso told *Tejada* to

"aim" at Raymond (in the blue shirt) when Tejada went downstairs to shoot. *See* Tr. at 156

(Tejada: "He told me to go—he told me go in the backyard, which is the playground, and aim at

13

the guy with the blue shirt and then run back to the car."). When they were looking out the window, Siri-Reynoso was pointing out Torres's getaway car, which was parked on Concord Avenue off East 152nd Street, consistent with the direction of Tiburcio's window. *Id.* at 156-57. Accordingly, there was no inconsistency between Tejada's testimony, the video footage, and the direction of Tiburcio's window.

### *Tejada's Membership in the MacBallas*

Siri-Reynoso's culpability for causing the murder of Jessica White is unaffected by Tejada's membership in the MacBalla/Bloods gang, a claim Siri-Reynoso unsuccessfully made previously. Siri-Reynoso repeatedly points out that Tejada was not a member of the DDPs and claims he did not kill Jessica White to further any interest of that gang. *See, e.g.*, Pet. at 5, 10, 19, 23, 75; Supp. Pet. at 11. But these points are irrelevant. As jury was instructed, under 18 U.S.C. § 2(b) (causing an act to be done), Siri-Reynoso's mental state was the only one relevant when assessing his culpability for willfully causing a murder in aid of racketeering and in furtherance of a drug conspiracy. *See* Tr. at 1426 (defendant "willfully causes" crime if he "causes the criminal activity to happen and . . . does so with the state of mind that's necessary to commit the underlying crime"); *id.* at 1230 (Court noting that if Siri- Reynoso's closing argument focused on Tejada's motive, the Court would "add a sentence to the charge that says, ladies and gentlemen, you don't have to find anything about the state of mind of Mr. Tejada. The government doesn't have to prove any such thing."); *see also United States v. Whab*, 355 F.3d 155 at 161 n.3 (2d Cir. 2004) (defendant culpable under § 2(b) if has mental state needed to commit underlying crime and causes someone else to commit the act (citing *United States v. Gabriel*, 125 F.3d 89, 100 (2d Cir. 1997)).

14

### *Siri-Reynoso's Arrest Warrant*

There was a warrant for Siri-Reynoso's arrest at the time he was taken into custody on July 10, 2017. *See* Dkt. ##6, 24 (warrant signed by Magistrate Judge Kevin Nathaniel Fox on June 29, 2017, attached as an exhibit to Petition at page 86). Siri-Reynoso's argument to the contrary is frivolous.

### *Sufficiency of the Evidence*

A jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (quotation marks omitted); *see also McPherson v. Keyser*, No. 20-161, 2021 WL 4452078, at \*3 (2d Cir. Sept. 29, 2021).

This Court and the Second Circuit have already discussed the evidence that was sufficient to support Siri-Reynoso's conviction. *See* Dkt. #108 at 2-5; *Siri-Reynoso*, 807 F. App'x at 105-06; *see also* Dkt #101 at 2-19; 2d Cir. No. 19-516, Dkt. #88 at 3-15, 18-48. The Court will not belabor the point by reciting the same evidence yet again.

At bottom, there was overwhelming evidence of Siri-Reynoso's affiliation with the DDP gang and that gang's racketeering activity, as well as about Siri-Reynoso's gang-and drug-related motives for sending Tejada to shoot at Trinitarios, causing Jessica White's death. *See, e.g.*, Tr. at 137-42, 179-80, 204-05, 418-19, 520, 533-39, Supp. 2d at 358 (same).

Siri-Reynoso's sufficiency of the evidence challenge is as meritless today as it was when first presented to the Court in his Rule 29 Motion.

### *Siri-Reynoso's Ineffective Assistance Claims*

A defendant attacking his conviction based on ineffective assistance of counsel must overcome a high hurdle. He must: (a) show that counsel's performance "fell below

15

an objective standard of reasonableness" under "prevailing professional norms," and (b)

"affirmatively prove prejudice," *i.e.*, demonstrate that "there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." *Strickland v. Washington*, 466 U.S. 668, 687-89, 693-94, 104 S.Ct.

2052, 2064-65, 2067-68 (1984); *accord United States v. Vegas*, 27 F.3d 773, 777 (2d

Cir. 1994). In analyzing a claim that trial counsel's performance fell short of

constitutional standards, a court "'must indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance,' bearing in

mind that 'there are countless ways to provide effective assistance in any given case' and

that 'even the best criminal defense attorneys would not defend a particular client in the

same way.'" *Aguirre*, 912 F.2d at 560 (quoting *Strickland*, 486 U.S. at 689).

Siri-Reynoso claims that his counsel were ineffective for failing to "look at Mr.

Siri- Reynoso's cell phone activity," Form Pet. at 4; however, for the reasons explained

above, *see supra*, Siri-Reynoso's cell phone activity was not helpful to his defense, and

he therefore suffered no prejudice even if his able counsel did not "look" at it—which I

very much doubt.

Siri-Reynoso also complains that his counsel committed some prejudicial errors

with respect to the indictments in this case. He alleges that his first counsel, Richard Jasper,

Esq., waived his right to be charged by indictment. Form Pet. at 11. However, Mr. Jasper

did no such thing. Siri-Reynoso was only charged by indictment and superseding

indictment in this case, and he raises no reason that his lawyers should have argued the

indictments were improper (beyond calling one indictment "fake," with no factual support).

Siri-Reynoso also appears to argue that his trial counsel, Mr. Jason Foy, Esq., provided

16

ineffective assistance by not objecting that the S6 Superseding Indictment was filed late pursuant to 18 U.S.C. § 3161(b). (Supp. Pet. 3-6). That Section provides that an indictment "shall be filed within thirty days from the date on which [an] individual was arrested." That 30-day rule, however, only applies to charges made in a complaint but not made in an initial, timely indictment. *United States v. Deas*, 596 F. Supp. 2d 319, 323 (D. Conn. 2009) ("[T]he thirty-day rule is very clear: it is only when a superseding indictment asserts a charge that was included in the criminal complaint but was not included in the original, timely indictment that 3161(b) is violated."). Siri-Reynoso was not charged by complaint at all in this case and Section 3161(b) had no application here. *Id.* Therefore, Mr. Foy was not ineffective to failing to make such an argument.

Siri-Reynoso appears to argue that Richard Jasper, Esq.—who was assigned to represent Siri-Reynoso during part of the pre-trial phase of this case, before Siri-Reynoso decided to change counsel—had a conflict. *See* Pet. at 67. However, Siri-Reynoso does not explain what the conflict was, except by refence to the fact he believes he was arrested without an arrest warrant, which is false, *see supra*, and that Mr. Jasper consented to Siri-Reynoso's initial detention at presentment, which is hardly surprising where he was charged with racketeering murder.

Siri-Reynoso also claims that Jason Foy, Esq., his trial counsel, had a conflict related to the difficulty Mr. Foy said he would have preparing for trial at one point. *See* Pet. at 69. But Mr. Foy raised those concerns with the Court and the Court addressed them. The fact that Mr. Foy allegedly informed Siri-Reynoso he would ask to be relieved from the case after trial does not show a conflict in violation of the defendant's Sixth Amendment rights. In fact, Mr. Foy more than ably represented the defendant at trial. Mr. Foy is one of

17

the finest attorneys on this Court's CJA panel. Mr. Foy surely knew how to advise the
Court of any constitutional conflict with his client; as did Siri-Reynoso for that matter, who
was not shy about directly addressing the Court.

Siri-Reynoso also claims, with no support, that Mr. Foy "did nothing about" the
Government's witness list, *see* Pet. at 71; that is plainly contradicted by Mr. Foy's fine
cross-examination of the Government's key witnesses.

Siri-Reynoso also claims that Mr. Foy also had a "compromised" private
investigator who did not properly investigate the case. *See* Form Pet. at 4. As support for
this claim, Siri- Reynoso points to the investigators' alleged failure to contact his phone
provider regarding his phone records or visit the scene of the murder to see that Ms.
Tiburcio's window allegedly faced the wrong direction. Again, these claims are factually
false and unhelpful to Siri-Reynoso.

In his Supplemental Petition, Siri-Reynoso also appears to argue that Mr. Foy was
ineffective for failing to argue at trial or to the Court that the evidence was insufficient to
convict Siri-Reynoso of a murder rather than a manslaughter. (Supp. Pet. 6-16). Siri-
Reynoso argues that because Ms. White was an innocent bystander, and because Siri-
Reynoso and Tejada intended to shoot Siri-Reynoso's gang rival, and not Ms. White, Siri-
Reynoso's crime was manslaughter, not murder. (Supp. Pet. 14). That argument ignores the
overwhelming evidence that Siri-Reynoso intended a murder, including: (i) the "kill on
sight" relationship between DDPs and Trinitarios (Tr. 1006-07); (ii) Siri-Reynoso's
providing Tejada a gun and face mask that night (Tr. 157-59); (iii) Siri-Reynoso's
instructing Tejada to "clap" a particular Trinitario rival (Tr. 159); (iv) his arranging a
getaway car (Tr. 156); (v) Luis Nunez's call to Siri-Reynoso after Tejada said he shot a

18

Trinitario in which Nunez said "We got him" (Tr. 168); (vi) Siri-Reynoso's celebration in the apartment after ambulances arrived outside after the murder (Tr. 428); and (vii) Siri-Reynoso's bragging posts on Facebook six days after the murder (Tr. 179-80). All of that evidence, plus more, was more than sufficient for the jury to find Siri-Reynoso intended a murder, and makes it not surprising that Mr. Foy, in an entirely reasonable exercise of trial strategy, decided not to lose credibility with the jury by arguing a manslaughter instead of a murder. Finally, Siri-Reynoso's focus on Ms. White's status as an innocent bystander ignores the doctrine of transferred intent. *See United States v. Rahman*, 189 F.3d 88, 141 (2d Cir. 1999).

### Historical Cell Site Data

For years, the plain text of the Stored Communications Act authorized the Government and law enforcement to obtain historical cell-site data by getting a court order upon a showing that there were reasonable grounds to believe the information sought was relevant and material to an ongoing criminal investigation. 18 U.S.C. § 2703(c) and (d); *see also Carpenter v. United States*, 138 S. Ct. 2206, 2210 (2018).

On June 22, 2018, in *Carpenter v. United States*, 138 S. Ct. at 2206, the Supreme Court held for the first time that a search warrant is required for law enforcement to obtain historical location records from a phone service provider. This decision ran counter to decades-old precedent, recognized in this Circuit and elsewhere, that said "individuals lack any protected Fourth Amendment interests in records that are possessed, owned, and controlled only by a third party." *Id.* at 2226-27 (Kennedy, J., dissenting) (citing *Smith v. Maryland*, 442 U.S. 735 (1979), and *United States v. Miller*, 425 U.S. 435, 445-46 (1976)); *see also, e.g.*, *United States v. Ulbricht*, 858 F.3d 71, 97 (2d Cir. 2017) ("We

19

remain bound, however, by that rule [the third- party doctrine] until and unless it is overruled by the Supreme Court."). The overwhelming majority of federal courts that ruled on the issue before *Carpenter* held that a search warrant and probable cause were not required to obtain historical cell-site location information. *See, e.g.*, *United States v. Graham*, 824 F.3d 421, 427 (4th Cir. 2016) (*en banc*); *United States v. Davis*, 785 F.3d 498, 511-13 (11th Cir. 2015) (*en banc*); *In re Application of U.S. for Historical Cell Site Data*, 724 F.3d 600, 614-15 (5th Cir. 2013); *United States v. Caraballo*, 963 F. Supp. 2d 341, 360 (D. Vt. 2013); *see also United States v. Pascual*, 502 F. App'x 75, 80 & n.6 (2d Cir. 2012), *cert. denied,* 134 S. Ct. 231 (2013) (the "general principles" of third-party doctrine "point[ ]" toward this conclusion regarding cell-site records).

Although *Carpenter* changed the law in this area, it did not mandate—nor has it resulted in—the retroactive exclusion of evidence or reversals of convictions based on the Government's prior reliance on § 2703(d). This is because courts have consistently held that the good-faith exception to the exclusionary rule applies in this context. Because the exclusionary rule is a "judicially created remedy" that is "designed to deter police misconduct rather than to punish the errors of judges and magistrates," *United States v. Leon*, 468 U.S. 897, 906, 916 (1984), its application "has been restricted to those situations in which its remedial purpose is effectively advanced," *Illinois v. Krull*, 480 U.S. 340, 347 (1987). The rule therefore does not apply "where [an] officer's conduct is objectively reasonable" because suppression "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Leon*, 468 U.S. at 919; *see also Herring v. United States*, 555 U.S. 135, 140-41 (2009) (exclusion of evidence is a "last resort, not [a] first impulse," and "the exclusionary rule is not an individual right and

20

applies only where it results in appreciable deterrence" (quotation marks and citations omitted)).

Indeed, courts in this Circuit and elsewhere have uniformly held that the good-faith exception applies to the pre-*Carpenter* collection of historical cell-site location data pursuant to a § 2703(d) court order, *United States v. Chambers*, 751 Fed. App'x 44, 46-48 (2d Cir. 2018), or even a mere subpoena with no judicial imprimatur at all, *United States v. Zodhiates*, 901 F.3d 137, 143-44 (2d Cir. 2018). *See also United States v. Beverly*, 943 F.3d 225, 235-36 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 2550 (2020) (noting that even Carpenter's own conviction was affirmed on the basis that agents acted in good faith when relying on a § 2703(d) order for location information, and collecting cases from Second, Third, Sixth, Seventh, Ninth, and Eleventh Circuits); *see also, e.g.*, *United States v. Key*, No. 12 Cr. 712 (SHS), 2019 WL 2314693, at \*4 (S.D.N.Y. May 31, 2019); *United States v. Carrano*, 340 F. Supp. 3d 388, 397 (S.D.N.Y. 2018); *United States v. Gyamfi*, No. 16 Cr. 521 (CM), 2018 WL 6332902, at \*1-2 (S.D.N.Y. Nov. 13, 2018); *United States v. Guillen*, No. 17 Cr. 512 (KMW), 2018 WL 5831318, at \*15 (S.D.N.Y. Nov. 7, 2018).

Even if this argument were not procedurally defaulted, it is meritless. The Supreme Court's *Carpenter* decision was handed down sixteen months after the Government obtained the § 2703(d) Order for Siri-Reynoso's historical cell-site location data, and less than a month before the start of Siri-Reynoso's trial. Law enforcement thus plainly acted in good faith when relying on the court's long-recognized statutory authority to order the production of such data. Because the change in law brought about by *Carpenter* has already necessarily changed law enforcement's (and courts') practices in this area, there is no law enforcement action to be "meaningfully deter[red]" by applying the exclusionary rule in

this case, nor was there any Government conduct "sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144; *cf. Davis v. United States*, 131 S. Ct. 2419, 2429 (2011) ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule."). Accordingly, Siri-Reynoso is not entitled to any relief based on the collection and use of his historical cell-site data.

### *Government Misconduct*

Siri-Reynoso alleges various instances of Government misconduct. Chief among his complaints is that the Government knowingly introduced "false evidence and false testimony." Pet. at 37; Form Pet. at 6. In order to establish a claim for prosecutorial misconduct based on the use of false testimony, the petitioner must establish "(1) there was false testimony, (2) the [prosecutor] knew or should have known that the testimony was false, and (3) there was 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Thomas v. Kuhlman*, 255 F.Supp.2d 99, 108 (E.D.N.Y. 2003); *accord Russell v. Rock*, No. 08 Civ. 1894, 2008 WL 5333327, at *4 (E.D.N.Y. Dec. 19, 2008).

Siri-Reynoso offers no support for claims of false testimony or false evidence, never mind the Government's knowing use of such evidence, nor that it would have affected the outcome of the trial. Siri-Reynoso simply disagrees with the jury's conclusions based on the evidence, by, for example, citing to: (a) his belief that certain cell phone records were somehow helpful to him, *see* Pet. at 39 *et seq.*, & n.1, 40 n.4, 44 n.9; (b) a claimed lack of corroboration for certain testimony, *see id.* at 39 n.2; (c) the alleged absence of corroborating surveillance video and other evidence, *see id.* at 40 n.3, 41 n.5,

22

42 n.6, 45 n.11; (d) his confusion about the "aim at" testimony, *see id.* at 42 n.7, *supra* p. 23-24; and (e) alleged minor inconsistencies in witness testimony, *see id.* at 43 n.8, 44 n.10. In essence, Siri-Reynoso is simply repackaging his insufficiency of the evidence claims as claims of Governmental misconduct.

Siri-Reynoso similarly claims that prosecutors made misrepresentations or false statements to the Court or jury. *See* Pet. at 6-7. His claims are once again simply disagreements with arguments and conclusions drawn from the evidence; conclusions with which the jury, Court, and Second Circuit agreed as to convicted conduct. Similarly, Siri- Reynoso's desire for more corroborating evidence, *see* Pet. at 7-8, beyond that which the jury already found sufficient to convict him, does not mean that prosecutors lied in arguments to the Court or jury.

Siri-Reynoso alleges that video surveillance evidence was somehow destroyed. *See* Pet. at 47. Siri-Reynoso references certain video surveillance clips that appear to skip—a topic that the Government in fact brought out and explained at trial. *See* Tr at 45-48, 714-16. Siri-Reynoso's able counsel had a full opportunity to test such evidence, cross-examine witnesses regarding it, and make arguments to the jury regarding the same. Siri-Reynoso offers zero support for his claim that any evidence was affirmatively destroyed, or even how any additional video evidence would have helped his defense.

Siri-Reynoso makes certain claims regarding the July 2013 shooting of Miguel Carela, for which he was previously investigated and for which he was acquitted at trial. *See* Pet. at 49-51. Siri-Reynoso claims that "false evidence" was used against him regarding Carela's testimony that he did not pick Siri-Reynoso out of a lineup as the shooter in that incident. Siri- Reynoso also appears to make some claim regarding New

23

York City Police Department ("NYPD") Detective Peter Cullen's involvement in the prior investigation of the July 2013 shooting and the instant case, and references his status as a federal task force officer with the Federal Bureau of Investigation, *see* Form Pet. at 6. Siri-Reynoso makes no recognizable claim regarding the July 2013 shooting or Detective Cullen's status as a task force officer, and he offers no factual basis for any right to relief on these bases.

Siri-Reynoso makes some reference to the June 2018 superseding indictment being improperly filed, *see* Pet. at 53 or "falsified," Form Pet. at 6. But there were no errors with respect to the filing of the superseding indictment, nor was any indictment falsified in any way. And Siri-Reynoso presents no evidence that the indictment was false.

Siri-Reynoso also appears to argue that there was an error in his July 2017 arrest warrant not being docketed until August 2017. *See* Pet. at 55. Siri-Reynoso makes no cognizable claim of Government misconduct with respect to this, nor do any facts support such a claim.

### *Judicial Misconduct*

The Supreme Court has established that due process "requires a 'fair trial in a fair tribunal' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley,* 520 U.S. 899, 904 (1997) (quoting *Withrow v. Larkin,* 421U.S. 35, 46 (1975), and citing *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 821-22 (1986), and Tumey *v. Ohio,* 273 U.S. 510, 523 (1927)). In order to prevail on a claim of judicial bias, a defendant must show that he did not receive a trial "by an unbiased and impartial judge without a direct personal interest in the outcome of the hearing." *Ungar v. Sarafite,* 376 U.S. 575, 584 (1964). However, "[m]ere allegations of judicial bias or

24

prejudice do not state a due process violation." *Brown v. Doe,* 2 F.3d 1236, 1248 (2d Cir.1993), *cert. denied,* 510 U.S. 1125 (1994).

"Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal." *Liteky v. United States,* 510 U.S. 540, 555 (1994).

Siri-Reynoso's claims of judicial bias fail. *See* Pet. at 72, *et seq.* First, they are procedurally defaulted because they could have been, but were not, raised on direct appeal. Second, they fail on the merits. Siri-Reynoso's claims are routed in complaints about judicial rulings that he disagrees with, for example, that: (a) the surveillance video footage was admitted; (b) drug conspiracy evidence was admitted; (c) a photo of a DDP tattoo on Siri-Reynoso's hand was taken; (d) a superseding indictment was filed; and (e) his pretrial motions were denied. *See* Pet. at 74-77. Such claims do not support a finding of judicial bias.

Siri-Reynoso also references that Detective Cullen, one of the case detectives, became a federal task force officer during the pendency of his case. But the Court plainly had no involvement in that decision, and it had no improper impact on Siri-Reynoso's case. Siri-Reynoso also again relies on his false and frivolous claim that the Court improperly allowed a juror to be replaced during deliberations—an argument the Court dismissed out of hand when ruling on Siri-Reynoso's post-trial motions. *See* Dkt. #108 at 6 ("Juror number 6 was always juror number six. She was never an alternate. As meritless a

25

motion as the Court has ever entertained, the motion is denied—there is absolutely no need for an evidentiary hearing."). Siri-Reynoso also wrongly claims that the Court "became enraged" towards one of his defense lawyers during trial, when in fact the Court praised his trial counsel for their excellent performance.

Finally, Siri-Reynoso claims that the Court had a conflict of interest based on "personal animus against those deems unworthy of possession Constitutional rights" and a history of "be[ing] the one who prosecute criminal defendants, not protect them from encroachments by corrupted State Cops." Pet. at 74. Siri-Reynoso offers absolutely no support for his baseless allegations of judicial bias or other misconduct.

### *United States v. Davis*

Siri-Reynoso cites *United States v. Capers*, 20 F.4th 105 (2d Cir. 2021), and its application of *United States v. Davis*, 139 S. Ct. 2319 (2019), for the proposition that his conviction for murder through use of a firearm under § 924(j) must be vacated because a racketeering conspiracy is not a "crime of violence" under that statute. *See* Supp. Pet. at 2.

But Siri-Reynoso's predicate crimes underlying his § 924(j) count did *not* include a racketeering conspiracy—his predicates were a murder in aid of racketeering, in violation of 18 U.S.C. § 1959, and a narcotics conspiracy, in violation of 21 U.S.C. § 846. Post-*Davis*, murder in aid of racketeering remains a "crime of violence" and thus a valid § 924(j) predicate. *See United States v. Sierra*, 782 F. App'x 16, 20-21 (2d Cir. 2019). And § 924's application to "drug trafficking crime[s]" was unaffected at all by *Davis*, meaning that the narcotics conspiracy remains a valid § 924(j) predicate. *See United States v. Herrmann*, No. 16 Cr. 814 (LGS), 2022 WL 379714, at \*2 (S.D.N.Y. Jan. 13, 2022); *McKnight v. United States*, 15 Cr. 607 (JPC), 2021 WL 5647792, at \*3 (S.D.N.Y. Dec. 1,

26

2021) (collecting cases); *see also, e.g.*, *United States v. Crawley*, 2 F.4th 257, 262-63 (4th Cir. 2021); *In re Navarro*, 931 F.3d 1298, 1302 (11th Cir. 2019).

Conclusion

Siri-Reynoso's petition is denied in its entirety.

The Court declines to issue a certificate of appealability because there has been no "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see United States v. Perez*, 129 F.3d 255, 260 (2d Cir. 1997). Further, the Court finds, pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from an order denying Siri-Reynoso's motion would not be taken in good faith. *See Feliz v. United States*, No. 01-cv-5544, 2002 WL 1964347, at *7 (S.D.N.Y. Aug. 22, 2002).

This constitutes the decision and order of the Court.

Dated: January 3, 2023

_____
United States District Court Judge

27